Filed 8/11/22  P. v. Evans CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079167 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE381756) |
| DERRICK L. EVANS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed in part, reversed in part and remanded.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, and Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

Derrick L. Evans appeals from a judgment imposed after a jury convicted him of crimes arising from an attempted robbery of a marijuana

dispensary. Under newly enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) eff. Jan. 1, 2022 (Assembly Bill No. 333), we reverse the jury's true findings on the gang enhancements, but otherwise find no reversible error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Attempted Robbery*

Karla R. and Anthony B. worked at an illegal marijuana dispensary in Spring Valley on the second floor of a business complex. It was a cash business. The cash was stored in a drawer underneath a laptop computer used to record sales. Inside the dispensary, there were seven surveillance cameras connected to a monitor in the back room.

On April 16, 2018, between 11:00 and 11:30 p.m., two armed men entered the dispensary and tried to rob it. They were carrying duffel bags and semiautomatic firearms. One of the men pointed his gun at Karla and ordered her to put the cash from the drawer into one of the duffel bags. She complied. The other man was near Anthony, demanding to know the location and combination for the safe. When Anthony did not tell him, the man pushed him and struck him in the head with his gun.

After being forced to the ground, Anthony got up, ran out of the dispensary, and jumped from the second floor to the ground to escape the robbers. The two robbers followed him out of the dispensary. Shortly after they exited, Karla heard a gunshot. She gathered her belongings, went outside to her car, and drove home. On her way home, she called 911.

When the police arrived, they found Anthony on the ground outside the dispensary. He was bleeding from a laceration to his head, but no gunshot injury. Inside the dispensary, there was blood on the floor in multiple locations. The police also found two duffel bags in the dispensary; one

2

containing cash and the other containing marijuana product. They collected the surveillance videotape. They also lifted a palm print and partial fingerprint from a glass countertop.

Anthony appeared to be traumatized from the incident. He never identified either of the robbers and did not provide a description. There were several customers in the dispensary at the time of the robbery, but they were gone by the time the police arrived and were never identified.

Karla was the only eyewitness to the robbery who testified at trial. Karla testified that she would not be able to recognize the robbers if she saw them again and was not able to recognize anybody in court. She could not identify anything distinguishing about either of the two men. She was never shown a photo lineup or physical lineup and had never identified either of the two robbers.

B. *Additional Police Investigation*

The police viewed the surveillance videotape of the robbery. It showed that one of the robbers had tattoos on the back of his left hand with a dollar sign and other designs surrounding it. He was wearing red and white shoes, jeans with frayed rips above and below the left knee and below the right knee, and a black jacket with silver snaps or buttons and a white inner lining. The hood of the jacket was pulled over his face. It was not possible to identify this robber from the videotape, because it did not show a clear shot of his face.

The videotape showed that during the robbery, the other robber put his left hand down on the glass countertop in the location where the police later recovered the palm print and fingerprint. The police identified this palm print as the left palm of Donald Sheffield. At trial, Detective Alan Campagna

3

identified Sheffield as one of the two robbers from a "pretty clear shot of his face" on the surveillance videotape.

The police executed search warrants for Sheffield's social media accounts, which led them to Evans's social media accounts. Photos posted on Evans's social media accounts before the robbery showed that he had a dollar sign tattoo on the back of his left hand, and he wore ripped jeans, red and white shoes, and a black jacket. Another photo showed Evans and Sheffield together. (!4 RT 257)!

About six weeks after the robbery, the police arrested Sheffield and searched the vehicle he was driving. In the vehicle, they found a semiautomatic handgun and loaded magazine.

The police arrested Evans at an apartment in San Diego the same week. Inside a duffel bag where Evans kept his clothing, the police found his identification card, a pair of red and white Air Jordan shoes, and ripped jeans.

On direct examination, Detective Campagna testified that the red and white shoes recovered from Evans's duffel bag "resemble the shoes that were used during the robbery." He described them as "pretty much identical" but acknowledged he could not testify they were "the exact same shoes that were worn that night." In his opinion, the similarities included "the shininess of the toe portion." Detective Campagna further testified that the red and white shoes worn by Evans in a photo posted on his social media "appear to be the shoes that I collected when I arrested him and the shoes that were worn during the robbery."

According to Detective Campagna, the ripped jeans recovered from Evans's duffel bag were also "similar to the jeans that were used in the crime." He based this on the unique pattern of the rips and fraying that was

4

also visible on the videotape. In his opinion, the ripped jeans Evans was wearing in one of his social media postings also appeared to be the same ripped jeans worn by the robber and recovered from Evans's belongings.

Detective Campagna further testified that the black jacket worn by Evans in one of his social media postings "does appear to be the jacket that was worn during the robbery as well." He based his opinion on "the middle button being so low, it's an unusual place to put a button."

Finally, Detective Campagna testified that the dollar sign tattoo depicted on the back of Evans's left hand in his social media postings "pretty much resembles the person that committed the crime." He based this on the design of the tattoo and "the way it's surrounded by the existing tattoos and . . . the space around it, and also the space that's towards the bottom part of his hand. . . ." Although Detective Campagna had seen dollar sign tattoos before, he had never seen one surrounded by these other designs.

On cross-examination, Detective Campagna admitted that Air Jordan shoes are "very common." He also admitted he could not say "definitively" that the Air Jordan shoes recovered from Evans's belongings were the same ones worn by the robber.

Detective Campagna also admitted he could not tell what brand or size the jeans were from the videotape. He acknowledged that ripped jeans are common, and that pre-ripped jeans are sold in stores. However, he believed "it would be extremely difficult for someone to replicate those holes, the threading and the whole nine yards." Detective Campagna could not prove "definitively" that they were the same jeans, but testified, "I would bet to say they are."

On redirect, Detective Campagna testified that the Air Jordan shoes recovered from Evans were "definitely the same shoe, make and model" as

5

the ones worn by the robber, but there was nothing distinctive or personalized about them. However, the jeans appeared to him to be more personalized. He explained: "When you look at [brand name] ripped jeans, you can almost tell the ripped jeans were put in the same place by the manufacturer. [¶] These jeans didn't appear to me that way. I've never seen any jeans anywhere similar to that. Plus the way the threading is coming off the rips, I've never seen threading coming off the rips, and that's what leads me to believe they were the same jeans."

The prosecution played the surveillance videotape during trial. The court admitted into evidence the videotape and still images from the videotape. The court also admitted into evidence photos of the Air Jordan shoes and ripped jeans recovered from Evans's belongings, photos from his social media postings showing his dollar sign tattoo and him wearing the Air Jordan shoes, ripped jeans, and black jacket, and the photo he posted of himself with Sheffield.

C. *Gang Evidence*

The parties stipulated that the Neighborhood Crips is a criminal street gang within the meaning of Penal Code section 186.22.[1]

Detective Sabakhan Sharrieff testified as a gang expert. He testified the Neighborhood Crips gang has adopted the Milwaukee Brewers logo of a baseball glove with four fingers. The gang also uses hand signs with four fingers, and its members have tattoos and other symbols with the numbers "4-1" and the word "Ace."

---

[1] The parties also stipulated that Evans had suffered a felony conviction before April 16, 2018, the date of the attempted robbery. Further undesignated statutory references are to the Penal Code.

Detective Sharrieff identified Sheffield and Evans as members of the Neighborhood Crips. He identified Evans as a member based on his association with other gang members, the location of his prior police contacts, and his gang-related tattoos and social medial postings. Evans has one tattoo with the numbers "4-1," another with the word "Ace," and another depicting a Milwaukee Brewers glove. His social media postings included photos of himself and others displaying hand signs used by the Neighborhood Crips, as well as other gang-related posts.

In Detective Sharrieff's opinion, if two members of the Neighborhood Crips were to commit an armed robbery together, the crime would benefit the gang and be committed in association with the gang.

D. *Trial and Sentencing*

In a jury trial, Evans was convicted of two counts of attempted robbery (§§ 211, 664), two counts of assault with a semiautomatic firearm (§ 245, subd. (b)), and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury found true allegations that Evans committed these crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and personally used a firearm (§ 12022.53, subd. (b)). However, the jury found not true allegations that Evans personally discharged a firearm. (§ 12022.53, subd. (c).)

Evans waived his right to a jury trial on the prior conviction allegations and admitted he had previously suffered a serious felony prior (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and a strike prior (§§ 667, subds. (b)-(i), 1170.12, 668).

The trial court sentenced Evans to 18 years four months in prison. The court imposed a restitution fine of $10,000 (Pen. Code, § 1202.4, subd. (b)) and a court operations fee of $200 (*Id.*, §1465.8). The court also imposed but

stayed a parole revocation restitution fine of $10,000 (*Id*., § 1202.45), a criminal justice administration fee of $154 (Gov. Code, § 29550), and a criminal conviction assessment fee of $180 (*Id*., § 70373).

DISCUSSION

I

Evans first argues there is insufficient evidence of his identity as a perpetrator of the crimes. We find substantial evidence to support the jury's finding that Evans was one of the two perpetrators.

In assessing a claim of insufficient evidence, the court must review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence, i.e., evidence which is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320.) Evidence which merely raises a strong suspicion of guilt is insufficient. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

There is substantial evidence of Evans's identity as one of the perpetrators. Evans's social media postings from before the robbery included a photo of himself and Sheffield, who was positively identified as one of the perpetrators by his palm print, the surveillance videotape, and Detective Campagna's trial testimony. As seen on the surveillance videotape, the perpetrator who committed the attempted robbery with Sheffield had a dollar sign tattoo surrounded by other designs on the back of his left hand, which matched the tattoo placement and designs on Evans's left hand. This perpetrator was also wearing red and white Air Jordan shoes and distinctively ripped and frayed jeans, which matched the clothing found in Evans's belongings six weeks later. Evans's social media postings from

8

before the robbery also showed him wearing the same red and white Air Jordan shoes and distinctive jeans, as well as a black jacket with silver buttons that matched the one worn by the same perpetrator.

Although any one of these pieces of evidence would not be enough to prove guilt beyond a reasonable doubt, they are legally sufficient when considered all together. The jury could conclude beyond a reasonable doubt that it was not a mere coincidence that Evans not only knew Sheffield well enough to post a photo of them together before the attempted robbery, but Evans also had a distinctive dollar sign tattoo surrounded by other designs on the back of his left hand, distinctive ripped and frayed jeans, red and white Air Jordan shoes, and a black jacket with silver buttons, all matching the distinctive tattoos and clothing of the other robber who committed the attempted robbery with Sheffield. As the prosecutor put it in arguing there was no reasonable doubt to the jury: "Is it reasonable to believe that somebody out there on April 16th, 2018 [committed the attempted robbery], with the exact same tattoo on his left hand as Mr. Evans, wearing the exact same Jordans Mr. Evans possesses, the exact same pair of ripped jeans Mr. Evans possesses and the exact same black jacket with a hoodie that Mr. Evans possesses with a person that Mr. Evans has taken a photograph with prior to the incident itself?"

Taken in its totality, we conclude there was reasonable, credible, and solid evidence sufficient to support the jury's finding that Evans was one of the perpetrators. " '[I]t is not necessary that any of the witnesses called to identify the accused should have seen his face. [Citation.] Identification based on other peculiarities may be reasonably sure. Consequently, the identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing.' " (*People v.*

9

*Mohamed* (2011) 201 Cal.App.4th 515, 522, quoting *People v. Lindsay* (1964) 227 Cal.App.2d 482, 494.)

## II

Evans next argues that defense counsel committed ineffective assistance of counsel by failing to object to Detective Campagna's lay opinion testimony about the similarities between Evans's tattoo and clothing and those of the perpetrator on the surveillance videotape. We again disagree.

To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Scott* (1997) 15 Cal.4th 1188, 1211.)

We find neither deficient performance nor prejudice. Defense counsel did not fall below an objective standard of reasonableness by failing to object to Detective Campagna's lay opinion testimony. A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.)

California courts "have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).) In *Leon,* a detective who had no prior familiarity with the defendant identified him as a person shown on the surveillance videos of two robberies, based on the detective's subsequent contacts with the defendant on and after arrest. (*Id.* at p. 600.) Over the defense's objection, the detective was also permitted to testify that the jacket worn by one of the perpetrators in the videos appeared to be the same jacket the defendant was

wearing when arrested. (*Ibid*.) He further testified that a car in the video looked like the car the defendant had crashed when fleeing from the police, and a baseball cap worn by one of the perpetrators looked similar to one found in the defendant's car. (*Id*. at pp. 600-601.) The Supreme Court concluded that because the detective's lay opinion testimony "was based on his relevant personal knowledge and aided the jury, the court did not abuse its discretion by admitting it." (*Id*. at p. 601.)

The same reasoning applies here. Detective Campagna's lay opinion testimony was rationally based on his perception of the similarities of the clothing and tattoo design, and it aided the jury in assessing these similarities. His testimony was admissible under Evidence Code section 800, and defense counsel was not deficient in failing to object to it. (See also *People v. Gonzales* (1968) 68 Cal.2d 467, 472 [trial court did not err in allowing officer to testify "that in his opinion the man he saw leave the bar was defendant, that clothing and specified characteristics of the man appeared to be the same as those of defendant, but that [the officer] did not see the facial characteristics of the man and could not positively identify defendant as the man"].)

Evans argues that Detective Campagna's lay opinion testimony was inadmissible because "the identification or comparison made must be one the jury could not adequately have made for itself." (*People v. Mixon* (1982) 129 Cal.App.3d 118, 129.) But the Supreme Court mentioned no such requirement in its more recent *Leon* decision, which found no error in the admission of a detective's lay opinion identification testimony based on a surveillance video. Despite finding no error, the Supreme Court explicitly acknowledged that "because the surveillance video was played for the jury,

11

jurors could make up their own minds about whether the person shown was defendant." (*Leon*, *supra*, 61 Cal.4th at p. 601.)

Even assuming any deficient performance, however, we find no reasonable probability of a result more favorable to Evans if Detective Campagna's lay opinion testimony had been excluded. The jury still would have had the surveillance videotape, the photographs of the shoes and jeans found in Evans's belongings, and Evans's social media postings showing him wearing the shoes, jeans, and jacket, including the photo Evans posted of himself with Sheffield. Even without Detective Campagna's testimony, the surveillance videotape and photographic evidence would have shown the similarities of the distinctively ripped and frayed jeans, the distinctive tattoo design and placement on the left hand, and the red and white Air Jordan shoes and black jacket with silver buttons. Moreover, the prosecutor in closing arguments essentially invited the jury to make its own comparison, rather than relying on Detective Campagna's opinions. The prosecutor told the jury: "I'm not an expert in ripped jeans and neither is the detective who testified about them. But you've seen the ripped jeans for yourself."

We therefore conclude that defense counsel did not provide ineffective assistance of counsel by failing to object to Detective Campagna's lay opinion testimony about the similarities of the clothing and tattoo.

III

Evans argues that the trial court committed reversible error by instructing the jury with CALCRIM No. 315 on eyewitness identification.[2] Evans does not dispute that CALCRIM No. 315 correctly states the law. However, he argues that there were no facts to support it because no eyewitness identified him as one of the perpetrators. Moreover, Evans asserts that the introductory sentence of CALCRIM No. 315 incorrectly suggested that a witness had in fact identified him as one of the perpetrators by stating, "You have heard eyewitness testimony identifying the defendant." According to Evans, this statement deprived him of his Sixth Amendment right to a jury trial.

We find no reversible error. As the People point out, there was in fact eyewitness testimony identifying Evans at trial—though not as a perpetrator

---

[2] As given, CALCRIM No. 315 stated in relevant part: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe . . . ? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify other participants in the crime? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification?"

13

of the crime. Detective Campagna identified Evans in court as the person he had arrested and whose belongings he searched approximately six weeks after the attempted robbery. Officer Kelvin Lujan also identified Evans in court as resembling a person he had contacted in a 2013 field interview. These in-court identifications of Evans were arguably a sufficient evidentiary basis for the trial court to give CALCRIM No. 315 on eyewitness identification.

We need not decide this issue definitively, however, because any error in giving CALCRIM No. 315 would be harmless under any standard of prejudice. Although it is error to give a legally correct instruction that is irrelevant or inapplicable, this is generally only a technical error which does not constitute grounds for reversal. (*People v. Cross* (2008) 45 Cal.4th 58, 67.) This is so "because the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application." (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.)

Considering the totality of the record, we find no reasonable probability the jury would have understood CALCRIM No. 315 to mean that there was some eyewitness who had in fact identified Evans as one of the perpetrators of the attempted robbery. The trial evidence unequivocally established that the only two eyewitnesses the police spoke to were Karla and Anthony, and neither was able to identify either of the perpetrators. Karla testified that she never identified either of the perpetrators, she would not be able to recognize them, and she could not identify anyone in court. Anthony also did not identify either of the perpetrators or provide a description. And the

14

customers who were in the store at the time of the robbery were gone by the time the police arrived and were never identified.[3]

In closing arguments, the prosecutor did not argue that any eyewitness had identified Evans and did not refer to CALCRIM No. 315. Moreover, defense counsel and the prosecutor both made it clear that Karla could *not* identify Evans. Defense counsel told the jury: "Out of all the people that you saw in that video that were in the dispensary that night, [Karla] was the only person we heard from, and she told us that she did not get a good look at the two people who entered that store. She wasn't able to provide a description as far as height, as far as weight, and she has never, to this day, identified Mr. Evans as one of the two men who came to the store that night, not through a lineup, not through a photo lineup, not through identification, not even ID here in court today." In his rebuttal argument, the prosecutor conceded: "Yes, [Karla] didn't identify anybody. . . . Nobody's relying upon her to identify anybody because we're relying upon the evidence for identification in this case . . . ."

In these circumstances, no reasonable juror could have interpreted CALCRIM No. 315 to mean that some eyewitness had in fact identified Evans as one of the perpetrators—contrary to the undisputed evidence and the arguments of counsel on both sides. Notably, "the trial court properly instructed the jury with CALCRIM No. 200 to disregard inapplicable jury

---

[3]    There was also a security guard present at the time of the attempted robbery. According to the probation report, the security guard "was determined to be part of the robbery" and "[c]harges were filed but subsequently dismissed." However, the jury heard no evidence of the security guard's alleged involvement or of any statements made by the security guard, and he did not testify at trial. There was no evidence from which the jury could have concluded that the security guard identified Evans or was involved in the robbery, nor did the prosecutor make any such argument.

15

instructions." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 502 [finding harmless error in giving of flight instruction that was not supported by substantial evidence].)  Thus, the jury knew to ignore CALCRIM No. 315 if it was not supported by the evidence.  To the extent the jury found CALCRIM No. 315 to be applicable at all, it could only have been for the permissible purpose of evaluating the in-court identifications of Evans made by Detective Campagna and Officer Lujan during trial.

Accordingly, we conclude that any error in giving CALCRIM No. 315 would be harmless under either the *Watson* or *Chapman* standard of prejudice.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)  For the same reasons, Evans has failed to establish the prejudice element of his claim of ineffective assistance of counsel for his attorney's failure to object to CALCRIM No. 315.  (*In re Fields* (1990) 51 Cal.3d 1063, 1079.)

IV

A.  *Assembly Bill No. 333 Amendments to Section 186.22*

Effective January 1, 2022, while Evans's appeal was pending, Assembly Bill No. 333 enacted new substantive and procedural provisions for imposing gang enhancements.  The parties agree that the new *substantive* changes to section 186.22 apply retroactively to Evans and require reversal of the gang enhancements.  However, Evans also contends that the new *procedural* provision requiring bifurcation of gang enhancements (§ 1109) applies retroactively and requires reversal of the entire judgment.  On the latter point, the People disagree.

Substantively, Assembly Bill No. 333 "amend[ed] section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343.)  At the time of trial, former

16

section 186.22 defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assembly Bill No. 333 narrowed the definition to "an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) This change requires that the People "prove that two or more gang members committed each predicate offense." (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1072; accord, *Lopez*, at pp. 344-345.)

Under the former version of section 186.22, the phrase " 'pattern of criminal gang activity' " was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [specified] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, by two or more *persons*." (Former § 186.22, subd. (e), italics added.)

Assembly Bill No. 333 changed this definition. Under the newly amended law, the predicate offenses must have been committed by two or more "members" of the gang (as opposed to any persons) and must have "*commonly* benefited a criminal street gang" and "the common benefit of the offense [must be] more than reputational." (§ 186.22, subd. (e)(1), italics added.) Additionally, the last of the predicate offenses must have occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed. (*Ibid.*) Finally, the currently charged offense no longer counts as a predicate offense. (*Id.*, subd.

17

(e)(2).)  The new law also reduces the number of qualifying offenses that can be used to establish a pattern of criminal gang activity, removing vandalism, looting and several fraud-related offenses from the list.  (*Id.*, subd. (e)(1)(A)-(Z).)

Assembly Bill No. 333 further requires the prosecution to prove that the benefit the gang derives from the predicate and current offenses is "more than reputational."  (Stats. 2021, ch. 699, § 3 [enacting § 186.22, subd. (g)].)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

Procedurally, Assembly Bill No. 333 added section 1109, which requires gang enhancements charged under section 186.22, subdivisions (b) or (d) to be tried separately from the underlying charges upon request from the defense.  (Stats. 2021, ch. 699, § 5.)  The defendant's guilt on the underlying offense must first be determined, and a trial on the gang enhancement is held if the defendant is first found guilty of the underlying offense.  (§ 1109, subd. (a).)

B.  *The Gang Enhancements Must be Reversed*

The parties agree that Assembly Bill No. 333's *substantive* amendments to section 186.22 apply retroactively to judgments not yet final on appeal under *In re Estrada* (1965) 63 Cal.2d 740.  Other courts have uniformly reached the same conclusion, and we concur with their holdings. (See, e.g., *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1126-1128 (*Ramos*); *People v. Burgos* (2022) 77 Cal.App.5th 550, 563-564 (*Burgos*); *People v. Perez* (2022) 78 Cal.App.5th 192, 206-207 (*Perez*); *People v. Ramirez* (2022) 79 Cal.App.5th 48, 63-64 (*Ramirez*); *People v. Montano* (2022) 80 Cal.App.5th

18

82, 104 (*Montano*); *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 (*E.H.*);

*People v. Sek* (2022) 74 Cal.App.5th 657, 667 (*Sek*).)

The People also concede that these newly enacted substantive amendments to section 186.22 require reversal of the gang enhancements. As the People note, Evans stipulated that Neighborhood Crips was a criminal street gang under the version of section 186.22 in effect at the time of trial. However, the record does not permit us to conclude as a matter of law that Neighborhood Crips was a criminal street gang under the new, more narrow definition contained in the amended version. Moreover, the prosecution's gang expert testified (and the prosecutor argued) that the attempted robbery benefited the reputation of the Neighborhood Crips gang, which is no longer a legally sufficient benefit under the new version of section 186.22. For these reasons, we accept the People's concession and reverse the section 186.22 gang enhancements. (*Burgos*, *supra*, 77 Cal.App.5th at pp. 563-564; *Perez*, *supra*, 78 Cal.App.5th at pp. 206-207; *Sek*, *supra*, 74 Cal.App.5th at pp. 668-670.)

C. *Failure to Bifurcate the Gang Enhancements was Harmless as to the Underlying Convictions*

The parties dispute whether the procedural provision of Assembly Bill No. 333 requiring a bifurcated trial of gang enhancements (§ 1109) applies retroactively to judgments not yet final on appeal. California courts are split on the issue. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1128-1131 [finding § 1109 is retroactive]; *Burgos*, *supra*, 77 Cal.App.5th at pp. 564-568 [same]; *Montano*, *supra*, 80 Cal.App.5th at pp. 105-108 [same]; *Perez*, *supra*, 78 Cal.App.5th at p. 207 [finding § 1109 is not retroactive]; *Ramirez*, *supra*, 79 Cal.App.5th 48, 65 [same].)

We need not resolve this question. Even assuming that section 1109 applies retroactively, we conclude that the failure to bifurcate the gang

19

enhancements did not result in a miscarriage of justice and would be harmless as to the underlying convictions. (See *Ramos, supra,* 77 Cal.App.5th at pp. 1125-1132 [reversing gang enhancement under Assembly Bill No. 333 but holding that failure to bifurcate gang enhancement under § 1109 was harmless as to underlying conviction]; *E.H., supra,* 75 Cal.App.5th at pp. 478-480 [same].)

For several reasons, there is no reasonable probability the jury would have reached a different result as to the underlying charges in a bifurcated trial. First, the gang-related evidence was relatively sanitized. Because Evans stipulated that Neighborhood Crips was a criminal street gang, the jury did not hear any inflammatory evidence of predicate gang-related offenses. The prosecution's gang expert testified only generally about active gang members committing crimes, but also acknowledged that there were "associate members" who "are the folks that just associate . . . because of family ties or they live in the community" and "don't necessarily participate in the gang activity." According to the expert, a person can be associated with gang members without being a gang member. The expert also testified that being a gang member is not itself a crime, and does not necessarily mean someone is a bad or violent person.

Second, the jury instructions prohibited the jury from considering the gang evidence to prove Evans's identity as one of the perpetrators of the attempted robbery. The court instructed the jury with CALCRIM No. 1403 as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements charged or the defendant had a motive to commit the crimes charged. [¶] You may not consider this evidence for any other purpose, and

20

you may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crimes." We presume that the jurors followed the trial court's instructions in the absence of any evidence to the contrary. (*People v. Krebs* (2019) 8 Cal.5th 265, 335; see also *Ramos*, *supra*, 77 Cal.App.5th at p. 1132 ["the jury was given a limiting instruction regarding its consideration of the gang evidence, which we presume it followed"].)

Third, the prosecutor himself hammered this point home to the jury in closing arguments. The prosecutor emphasized: "We heard an instruction her Honor just read you, [CALCRIM No.] 1403, that nobody's going to ask you to use either Mr. Sheffield's or Mr. Evans's affiliation with the Neighborhood Crips to determine the guilt of any of the crimes in this case. It's against the law, it's improper, and it's basically against everything we stand for as Americans to use what a person is against them in a court of law. You jurors have sworn not to do that. Nobody's going to ask you to do that." The prosecutor also told the jury, "it's okay to be a gang member. . . . Nobody is saying it shows bad character. Nobody is saying it shows you're a criminal." He continued: "The gang evidence aside, *forget about it when you're analyzing the charges themselves*, look at the video, look at the photographs, look at the evidence. [¶] . . . [¶] [T]his is not guilt by association. . . . Guilt by association is absolutely unfair." (Italics added.)

Fourth, at least some of the gang evidence would likely have been admissible even in a bifurcated trial on the substantive offense. Sheffield was positively identified as one of the perpetrators by his palm print on the display case, the surveillance videotape showing him placing his palm there, and Detective Campagna's identification. The fact that Evans was in the same gang as Sheffield and posted a photo of himself with Sheffield in a

21

social media post would likely have been admissible in a bifurcated trial to bolster the other evidence of his identity as the second perpetrator who committed the attempted robbery with Sheffield. "[N]othing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.)

Finally, as previously discussed, there was compelling evidence of Evans's guilt. The distinctive placement and design of the dollar sign tattoo and surrounding designs on the back of Evans's left hand matched one of the perpetrators in the video. Evans's distinctive ripped jeans and other clothing matched the same perpetrator in the video. And Evans knew the other perpetrator (Sheffield) well enough to have posted a photo of them together on social media before the attempted robbery. Considering the persuasive evidence of Evans's guilt, the absence of inflammatory details about other gang-related crimes, the jury instructions prohibiting the use of gang evidence to prove identity, and the prosecutor's closing argument emphasizing this point in the strongest of terms, we find no reasonable probability of a different result in a bifurcated trial.

We find unpersuasive the suggestion of one court that failure to bifurcate gang enhancements under section 1109 "likely constitutes 'structural error' " that defies harmless error analysis and requires reversal per se. (*Burgos*, *supra*, 77 Cal.App.5th at p. 568.) "There is a strong presumption that any error falls within the trial error category" and is "subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) The purpose of section 1109 is to prevent the jury from being swayed by prejudicial gang evidence in deciding the defendant's guilt on the underlying offense. As with any evidentiary error, the probable effect of

allowing a jury to hear such gang evidence may be quantitatively assessed and is not a structural error defying harmless error analysis. (*Montano*, *supra*, 80 Cal.App.5th at p. 108 [rejecting the *Burgos* suggestion of structural error]; see also *Ramos*, *supra*, 77 Cal.App.5th at p. 1131-1133 [applying *Watson* harmless error standard in holding defendant "was not prejudiced by the failure to bifurcate the gang enhancement allegation"]; *E.H.*, *supra*, 75 Cal.App.5th at p. 480 [applying *Watson* harmless error standard in holding defendant "cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated"].)

## V

Finally, Evans contends that the $10,000 restitution fine and $200 court operations fee imposed at sentencing should be reversed for the trial court to consider his ability to pay them under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).[4] Although Evans did not raise this issue at his original sentencing, he will have to be resentenced on remand in light of our reversal for further proceedings on the gang enhancements. Accordingly, we need not decide the issue in this appeal because Evans can raise the ability to pay issue on resentencing.

## DISPOSITION

The jury's true findings on the gang enhancement allegations (Pen. Code, § 186.22, subd. (b)) are vacated and the matter is remanded to the trial court with directions to: (1) give the People 60 days from the date of the remittitur to file an election to retry Evans on the vacated gang enhancements; (2) either conduct a new trial on the gang enhancements if the

---

[4] Other California courts have disagreed with the holding of *Dueñas*, and the issue is currently pending before our Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

People so elect or strike the gang enhancements if the People do not elect to retry them; and (3) resentence Evans. In all other respects, the judgment is affirmed. Following the conclusion of proceedings on remand, the trial court shall amend the abstract of judgment as necessary and forward copies of the amended abstract to the Department of Corrections and Rehabilitation.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.